Merrimack
No. 2004-356

THE STATE OF NEW HAMPSHIRE

v.

GEORGE KNICKERBOCKER, JR.

Argued: April 20, 2005
Opinion Issued: July 29, 2005

*Kelly A. Ayotte*, attorney general (*N. William Delker*, senior assistant attorney general, and *David W. Ruoff*, assistant attorney general, on the brief, and *Mr. Delker* orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

NADEAU, J. The State appeals the Trial Court's (*Fitzgerald*, J.) dismissal of an indictment against the defendant, George Knickerbocker, Jr., for second degree murder. We reverse and remand.

The trial court's order recites the following relevant facts. The defendant was charged with causing the death of Adam Robbins, a one-month-old infant. On February 18, 1983, the infant and his two-and-one-half-year-old brother, Joshua, were left in the defendant's care by their mother, Denise Robbins, in an apartment they and the defendant shared with Benoit St. Martin. Sometime after Denise returned home, she became

aware that Adam was experiencing unusual symptoms, including convulsions and difficulty breathing. Adam was hospitalized initially at Concord Hospital and later transferred to Dartmouth Hitchcock Medical Center, where he died early the next morning. An autopsy revealed that Adam died as a result of violent trauma to the head, probably by being struck with or against a blunt object.

The defendant first implicated Joshua, and later, Denise, in Adam's death. For reasons not entirely clear, the police essentially ceased investigating Adam's death in 1983, without bringing criminal charges against anyone.

In 1996, Denise contacted the Attorney General's office and requested action on her son's case. The case was not officially reopened, however, until January 2002. The defendant was indicted on February 21, 2003, just over twenty years after Adam's death. The defendant moved for dismissal due to the lack of speedy indictment, which the trial court granted. The State appeals.

In his motion to dismiss, the defendant asserted violations of both the State and Federal Constitutions. We first address the defendant's claims under our State Constitution, and cite federal opinions for guidance only. *See State v. Ball,* 124 N.H. 226, 231, 233 (1983).

The State contends that the trial court erred in dismissing the charge because the State did not intentionally delay indictment of the defendant in order to obtain a tactical advantage over him. Thus, the State urges us to answer affirmatively the question we left open in *State v. Nadler,* 151 N.H. 244 (2004); namely, "whether the defendant need prove, under the State Constitution, that the State's delay constituted a 'deliberate device to gain an advantage over him.'" *Nadler,* 151 N.H. at 247 (quoting *United States v. Gouveia,* 467 U.S. 180, 192 (1984)). This question has engendered a split among the federal circuit courts of appeal over the proper test for determining whether a pre-indictment delay violates the Fifth Amendment to the United States Constitution. *See Hoo v. United States,* 484 U.S. 1035, 1035-36 (1988) (White, J., dissenting from denial of certiorari).

A minority of federal circuits "hold that the proper inquiry is to balance the prejudice to the defendant [from the pre-indictment delay] against the Government's justification for delay." *Id.* at 1036. This comports with our interpretation of United States Supreme Court and First Circuit precedent in *State v. Philibotte,* 123 N.H. 240, 244 (1983). Specifically, in *Philibotte,* after recognizing that "an arbitrary delay between the time of an offense and the arrest or indictment of a defendant may result in a denial of due process," *id.,* we applied the following test for proving such a due process violation: "[T]he defendant must initially show that actual

prejudice has resulted from a delay. Once such a showing has been made, the trial court must then balance the resulting prejudice against the reasonableness of the delay." *Id.* (citations omitted).

The majority of federal circuits, on the other hand, "require[] a showing of prosecutorial misconduct designed to obtain a tactical advantage over the defendant or to advance some other impermissible purpose in order to establish a due process violation" under the Fifth Amendment. *Hoo*, 484 U.S. at 1036 (White, J., dissenting). This concept of prosecutorial misconduct has also surfaced in our case law. In *State v. Lacourse*, 127 N.H. 737, 741 (1986), for instance, we concluded that "the prosecution of th[e] action [wa]s timely because the defendant has failed to show actual prejudice as a result of the delay, or that the delay was intentionally employed by the State to gain a tactical advantage." *See also State v. Weeks*, 137 N.H. 687, 698 (1993) (observing that defendant did not claim intentional delay by the State for tactical advantage). The trial court in this case noted that "[t]he defendant does not argue, nor does the Court find, that the State intentionally delayed indicting the defendant in order to obtain a tactical advantage over, or to harass, the defendant."

The State contends that because our test for determining whether a pre-indictment delay violates due process is based upon federal precedent and "the [federal] case law has developed significantly since this Court first articulated the test for preaccusation delay in *Philibotte*," we should reevaluate this area of law and adopt the majority federal rule requiring a showing of governmental bad faith. We decline to do so.

We acknowledge that the majority of federal circuit courts of appeal, in reliance upon a line of United States Supreme Court cases consisting of *United States v. Marion*, 404 U.S. 307 (1971), *United States v. Lovasco*, 431 U.S. 783 (1977), *United States v. Gouveia*, 467 U.S. 180, and *Arizona v. Youngblood*, 488 U.S. 51 (1988), has "held that, in order to establish that a lengthy pre-indictment delay rises to the level of a due process violation, a defendant must show not only actual substantial prejudice, but also that the government intentionally delayed the indictment to gain an unfair tactical advantage or for other bad faith motives." *Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996) (quotation omitted). We do not believe, however, that the United States Supreme Court cases compel the interpretation given them by the majority of federal circuits. *Cf. United States v. Crouch*, 84 F.3d 1497, 1510 (5th Cir. 1996) ("recogniz[ing] that neither *Marion* nor *Lovasco* is crystal clear on th[e] issue"), *cert. denied*, 519 U.S. 1076 (1997); *Howell v. Barker*, 904 F.2d 889, 894 (4th Cir.) ("disagree[ing] that *Gouveia* is clear precedent"), *cert. denied*, 498 U.S. 1016 (1990). We decline to reexamine our State constitutional test on the basis of unsettled federal precedent.

■ We now clarify that notwithstanding the references to intentional delay for tactical advantage in *Lacourse*, 127 N.H. at 741, and *Weeks*, 137 N.H. at 698, the test for a due process violation under the State Constitution based upon pre-indictment delay is that set forth in *Philibotte*: "[T]he defendant must initially show that actual prejudice has resulted from a delay. Once such a showing has been made, the trial court must then balance the resulting prejudice against the reasonableness of the delay." *Philibotte*, 123 N.H. at 244 (citations omitted). As the trial court correctly ruled, "whether the Government acted in bad faith in delaying indictment" is "[o]ne factor to consider in assessing the reasonableness of the delay." *Cf. United States v. Ross*, 123 F.3d 1181, 1186 (9th Cir. 1997), *cert. denied*, 522 U.S. 1066 (1998).

With respect to the initial prong of the test, the requirement that the defendant show actual prejudice has been called a "heavy burden." *Id.* at 1185 (quotation omitted). The Sixth Circuit, in fact, has stated that "[t]he standard for pre-indictment delay is nearly insurmountable." *United States v. Rogers*, 118 F.3d 466, 477 n.10 (6th Cir. 1997). The defendant must show "actual prejudice that is definite and not speculative." *Ross*, 123 F.3d at 1185 (quotation omitted). "[A] showing of mere potential or possible trial prejudice does not suffice." *Crouch*, 84 F.3d at 1523. Moreover, the prejudice must be "substantial." *Id.* at 1515 (quotation omitted).

We have recognized that "the possibility of prejudice due to the dimming of memories is inherent in any delay and, alone, is insufficient to constitute a denial of due process." *Philibotte*, 123 N.H. at 244. Generally, when the unavailability of witnesses is the claimed source of prejudice, courts have "required that the defendant identify the witness he would have called; demonstrate, with specificity, the expected content of that witness' testimony; establish to the court's satisfaction that he has made serious attempts to locate the witness; and, finally, show that the information the witness would have provided was not available from other sources." *Jones*, 94 F.3d at 908; *see also Weeks*, 137 N.H. at 698. We will apply a similar test to a claimed failure of memory.

Some courts have required even more. For example, the court in *Rogers*, 118 F.3d at 475, noted that "[e]ven where a defendant specifies what a[n unavailable] witness's testimony would have been, actual prejudice is difficult to prove." It cited, as additional findings that have been required, that the unavailable witness "would have testified, that his testimony would have withstood cross-examination, and that the jury would have found him a credible witness." *Id.* (quotation and brackets omitted). In addition, the testimony would have to be "evaluate[d] . . . against the other

trial evidence to determine if indeed its introduction would affect the trial outcome." *Id.* (quotation omitted).

The stringency of these requirements highlights both the skepticism of some courts that "lost testimony can ever constitute actual prejudice given its generally speculative nature," *Ross,* 123 F.3d at 1185 (quotations and citations omitted); *see also Crouch,* 84 F.3d at 1516, and the recommendation of the Fifth Circuit that trial courts should generally defer, until after trial, ruling on motions to dismiss for pre-indictment delay:

> This means that dismissal on such a basis *prior to trial* will rarely (if ever) be appropriate. In all but the clearest and most indisputable cases, the district court, even though inclined to grant such a motion, should nevertheless normally withhold doing so until after the verdict, when the assessment of actual, substantial trial prejudice can more accurately be made.

*Crouch,* 84 F.3d at 1523; *cf. Marion,* 404 U.S. at 326. We agree with the Fifth Circuit's approach.

With the above considerations in mind, we examine each of the defendant's claims of prejudice. In this appeal, the defendant relies upon three of the alleged instances of prejudice found by the trial court, reserving the right, should this court remand, to "renew[] his [additional] claim[s] of actual prejudice at a further hearing below, as events and the record develop."

■ The defendant asserts that the standard of review in this matter is the unsustainable exercise of discretion standard. We stated in *State v. Hughes,* 135 N.H. 413, 419-20 (1992), that "we leave the trial court with discretion to deal with tardy indictments which have led to material prejudice to the defendant, prejudice either in his defense or in violation of other due process rights." This statement presupposes, however, that the defendant has in fact been prejudiced by the delay. Thus, while we would review the trial court's balancing of actual prejudice against the State's reasons for the delay under the unsustainable exercise of discretion standard, *cf. Ross,* 123 F.3d at 1184, we must separately review the initial finding of prejudice. "A finding of prejudice involves a mixed question of law and fact." *United States v. Beszborn,* 21 F.3d 62, 66 (5th Cir.), *cert. denied,* 513 U.S. 934 (1994). Accordingly, we review that finding *de novo. See State v. Simone,* 151 N.H. 328, 330 (2004).

The trial court found that the defendant had demonstrated actual prejudice with respect to witness Steven Plourde. Plourde was interviewed by police shortly after Adam's death, and indicated that he had known

Denise Robbins for approximately six to eight months. Plourde stated that on February 18, he was at the defendant and Denise Robbins' apartment when the two came home from Concord Hospital before heading to Dartmouth Hitchcock Medical Center. He also informed the officers "that he had never seen [the defendant] do anything to either one of the two children, and he thought that [the defendant], even though Adam wasn't his son, that he treated him like his own son, took pretty good care of him." The trial court found, however, that "according to a 2003 defense investigative report, Plourde does not recall being interviewed and he does not have a good memory of the events as they were described in the 1983 police report." The court found that Plourde's 1983 statement to police was not admissible under any evidentiary rule and that there was no other witness that would testify as to the defendant's fatherly treatment of Adam.

The State initially contends that the defense investigative report does not demonstrate that Plourde does not remember the defendant's treatment of Adam. Specifically, the State argues that the report does not indicate that Plourde was asked about how Adam was treated by the defendant. We agree that the 2003 investigative report is unclear on this issue. The 1983 police report reflects that Plourde was asked "whether or not he had seen Denise on February 18th," and records his response describing the events of that afternoon and evening including Denise's and the defendant's arrival from Concord Hospital, Denise's statements about Adam's injuries and her demeanor, and the absence of any statement by the defendant about what had happened to Adam. The police report then records general statements by Plourde about Denise and the defendant's treatment of Adam and Joshua.

The 2003 investigative report states, in relevant part:

> Plourde stated that this incident occurred a long time ago and he does not have a good memory of the *events* as they were outlined in the police reports at that time. Plourde advised that he does remember Denise and [the defendant] coming home from the hospital and that Denise was crying, however he does not remember either [the defendant] or Denise making any statement to him regarding Adam or his condition.
>
> Plourde as well *offered* that although it was the thing at that time, looking back now, he would say that Denise Robbins did have a major drug problem. Based on this he feels that at the time Denise was not a good mother due to her drug abuse and her young age. Plourde had nothing further to offer at this time.

(Emphasis added.)

Thus, the 2003 report indicates that Plourde did not remember well the events he described to police in 1983, presumably the specific events of February 18. This interpretation is bolstered by the remainder of the first paragraph quoted above, which describes what he does remember about that day. The second paragraph indicates that Plourde does have some memory of Denise's general parenting ability and suggests that he volunteered that information. That Plourde "had nothing further to offer at th[at] time" further suggests that he was probably not specifically asked about how the defendant treated either or both of the children. Plourde may well have a memory about the defendant's general treatment of Adam. Given the defendant's heavy burden to demonstrate actual prejudice, we conclude that he failed to show that Plourde does not remember the potentially exculpatory information contained in the 1983 police report.

Moreover, even if Plourde does not remember that information, we find some merit in the State's challenge to the trial court's conclusion that Plourde's statements in the 1983 police report are not admissible under any evidentiary rule. The court supported that conclusion by citing *Worster v. Watkins*, 140 N.H. 546, 550 (1995), in which we held that a police report was not admissible under the business records and public records exceptions to the hearsay rule. *See* N.H. R. Ev. 803(6), (8). The State argues, however, that Plourde's statement could be admitted as a prior recorded recollection or as statements in an ancient document. *See* N.H. R. Ev. 803(5), (16).

The State also offered, in its motion for reconsideration, to "stipulate to the admissibility of the police report[] to the extent necessary to eliminate any substantial material prejudice suffered by the defendant." As the defendant correctly notes, however, the trial court was entitled to reject this offer as new evidence proffered in a motion to reconsider. *See Keshishian v. CMC Radiologists*, 142 N.H. 168, 174 (1997). Nevertheless, in light of this offer, the defendant on appeal states that "there is no need to inquire into the scope of the ancient document or recorded recollection rules." Thus, the defendant does not dispute on the merits the admissibility of the statements under these exceptions. We conclude that if the preliminary requirements such as authentication are met, Plourde's statements may be admissible under one of these exceptions. *See Goy v. Jones*, 72 P.3d 351, 353 (Ariz. Ct. App. 2003); *Lawrence v. State*, 104 S.W.3d 393, 396 (Ark. Ct. App. 2003); *State v. Sargent*, 710 N.E.2d 1170, 1176 (Ohio Ct. App.), *appeal dismissed*, 694 N.E.2d 981 (Ohio 1998). If, following remand, Plourde cannot remember the relevant information at trial, the trial court should consider, if necessary, whether his 1983

statements are admissible under either the ancient document or recorded recollection exception.

The defendant contends, nevertheless, that finding these statements admissible will not answer the trial court's concerns about prejudice. Specifically, the trial court found that the State's offers to stipulate to the admissibility of these statements, among others, did not cure the prejudice to the defendant:

> The trial of this case will overwhelmingly rest on the credibility of witnesses. The testimony which the State now for the first time offers to admit as "ancient documents," does not paint a full and accurate picture of the witnesses on which the State will rely. In effect, the defendant will be limited to producing only that information which the police thought to seek from various witnesses at the time of the alleged crime. The court is convinced that a trial in this matter cannot be fair under the now existing circumstances.

■ The trial court's concern does not take into consideration the reality that "[p]ossible prejudice is inherent in any delay, however short." *Marion*, 404 U.S. at 322. "[T]he applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges. Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice . . . ." *Id.* (quotation and ellipses omitted). In balancing those relative interests with respect to the crime of murder, the New Hampshire legislature has concluded that no statute of limitations should be applied. *See* RSA 625:8, II (Supp. 2004). We find applicable here the Supreme Court's conclusion in *Marion*:

> [The defendant relies] solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that [the defendant] cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time [the defendant's] due process claims are speculative and premature.

*Marion*, 404 U.S. at 325-26.

The trial court also found that the defendant was prejudiced by the absence or lack of memory of Gary Yeaton. The trial court noted that although the defendant's memorandum in support of his motion to dismiss

asserted that Yeaton had been located but could not remember either Denise or the events surrounding Adam's death, the record contained no evidence that defense investigators had located and spoken with Yeaton. The court concluded that "[e]ither way, however, it is undisputed either that the defense is unable to locate Yeaton, or that Yeaton has been located but has no memory of the events of which he spoke [to police] in 1983."

According to a police report prepared in April of 1983, Yeaton had told police that he had recently seen Denise "carrying around, and showing all her friends, including [him], the autopsy report" on Adam. Yeaton told the police he "felt that it was really odd that a mother who had just lost her baby would be acting like she is, showing the results of the autopsy to everyone." The trial court found that if Yeaton were able to testify consistently with that statement at trial, it would help the defense by calling Denise's credibility into question.

The State argues that the court erred in finding prejudice because Yeaton's statement would be cumulative of other available evidence. It cites the testimony of other witnesses to whom Denise showed Adam's autopsy report. The defendant argues that none of these witnesses "describe[d] Denise's behavior as odd, and it is the oddness of the behavior observed by Yeaton that makes the information relevant." Even if we assume that the defendant's argument is correct, and that the testimony that Denise's behavior was odd was admissible, we conclude that this claim of prejudice is speculative at this time. Although the other witnesses, unlike Yeaton, did not volunteer an impression that Denise's behavior was unusual, it is not clear that such information would not or could not be elicited from them with proper questioning.

Moreover, as with Plourde's statement, Yeaton's statement may be admissible as a prior recorded recollection or as a statement in an ancient document. *See* N.H. R. Ev. 803(5), (16). Thus, we conclude that the defendant has failed to demonstrate actual prejudice at this time with respect to Yeaton.

The trial court also found prejudice with respect to Benoit St. Martin, the defendant's and Denise's roommate at the time of Adam's death. The police took statements from St. Martin in April and May of 1983. At that time, St. Martin told police that the defendant and Denise "said all different kinds of things [about what happened to Adam], somethin [*sic*] fell on his head like an ashtray or somethin [*sic*], or he was dropped accidentally like, I don't know." St. Martin also discussed seeing Denise attempting to contact, and later arguing with, the defendant, despite having obtained a restraining order against him.

When contacted by a defense investigator in 2003, St. Martin could not remember whether he was living with the defendant and Denise at the time of Adam's death, but believed he was not. He also did not remember any conversations with Denise or the defendant regarding Adam's death, although he did recall "possibly the police telling him something about a blunt object falling off of a windowsill or mantel and striking Adam, causing his death."

The trial court found:

> St. Martin's inability to recall conversations he had with the defendant and Denise regarding Adam's death is prejudicial to the defense. Earlier statements of St. Martin indicate that he heard different stories as to the cause of the child's death from both the defendant and Denise, which bears on Denise's credibility. Further, St. Martin's inability to recall correctly, or even at all with respect to certain matters, the events of 1983 pertaining to Adam's death indicates he would not be able to testify today to a crucial piece of evidence for the defense, namely, Denise's attempt at making contact with the defendant and later actually contacting him while a restraining order was in place, while the defendant was under investigation for the murder of her child, and after the defendant had allegedly confessed to her. Denise's conduct in that regard bears significantly on her credibility. Accordingly, the Court finds the defendant has established actual prejudice with respect to St. Martin.

The State first argues that the trial court erred in finding prejudice with respect to Denise's post-restraining order contacting of the defendant because "[t]here is . . . absolutely no indication in the defense investigator's report of his interview with St. Martin that he was ever asked about Denise's effort to contact the defendant in violation of the restraining order." We agree. The defense investigator's memorandum of interview says nothing about whether St. Martin has a present memory about the incidents of contact he reported in 1983. The trial court's conclusion that because St. Martin could not remember some of the events he discussed with police in 1983, he would not remember these events, is speculation. As such, it is insufficient to support a finding of prejudice. *Cf. State v. Varagianis*, 128 N.H. 226, 229 (1986).

The State also argues that the finding of prejudice with respect to St. Martin is erroneous because like those of Plourde and Yeaton, his statements could be admitted as a prior recorded recollection or as statements in an ancient document. *See* N.H. R. Ev. 803(5), (16). For the

reasons set forth above with respect to Plourde, we agree that St. Martin's 1983 statements may be admissible under one or both of these exceptions. Thus, the trial court's finding of prejudice was premature.

Because we conclude that the defendant has failed to establish actual prejudice due to his delayed indictment, we reach the same result under the Federal Constitution as we do under our State Constitution. *See Lovasco*, 431 U.S. at 790 ("[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim."). In addition, given our decision in this case, we need not address the State's argument that the trial court erred in relying upon the defense investigator's report (Defendant's Exhibit S) without allowing the State to cross-examine the investigator.

*Reversed and remanded.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.